IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREGORY DIDONATO d/b/a<br>SYNDICATED REPORTERS, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| U.S. LEGAL SUPPORT, INC. and<br>JOSEPH J. SARACO | : | NO. 15-6035 |

**MEMORANDUM**

**Padova, J.**                                                                                                      **August 17, 2017**

Plaintiff, Gregory DiDonato, d/b/a Syndicated Reporters, Inc., has brought this action against U.S. Legal Support, Inc. ("U.S. Legal") and Joseph Saraco, asserting claims arising out of a failed business arrangement between DiDonato and U.S. Legal. Before the Court is U.S. Legal's Motion for Summary Judgment. For the reasons that follow, we grant the Motion in part and deny it in part.

**I.      BACKGROUND**

In May 2012, DiDonato and U.S. Legal began to discuss entering into a business arrangement pursuant to which DiDonato, a court reporter, would shutter his small court reporting agency, Syndicated Reporters, Inc., and transfer his client list to U.S. Legal in exchange for "commissions, first-call status on certain assignments, and an expense allowance." (Concise Statement of Stipulated Material Facts ("SMF") ¶¶ 1, 3-4.) In June 2013, DiDonato did not receive the minimum number of weekly depositions from U.S. Legal that DiDonato claims he was promised according to the parties' business arrangement. (Id. ¶ 5.) Shortly thereafter, on July 10, 2013, U.S. Legal terminated its business relationship with DiDonato. (Id. ¶ 6.)

In July 2013, DiDonato retained Joseph Saraco as his counsel to resolve a fee dispute that DiDonato had with U.S. Legal. (DiDonato Aff. ¶ 3.) On July 18, 2013, Saraco sent an e-mail to U.S. Legal that included the following:

> I have been retained by Greg DiDonato to represent him in an issue with fees due him for services provided to your company . . . in particular with regard to World Trade Center Litigation. . . . [T]here seems to be a valid claim that my client is owed for fees he first credited to your company under the belief and promise that he would be assigned more work in the litigation. . . . Greg has authorized me to undertake appropriate legal action to protect his interests . . . .

(Pl.'s Concise Statement of Additional Facts Ex. B at 2-3; see also SMF ¶¶ 7-8; Hankey Decl. ¶¶ 5-6, Ex. A.) That e-mail was forwarded to David Hankey, counsel for U.S. Legal, who subsequently spoke with Saraco on several occasions in August and September 2013, regarding resolution of DiDonato's claims. (Hankey Decl. ¶¶ 4, 7; SMF ¶ 9.)

DiDonato did not give Saraco the authority to "negotiate, settle or act on [DiDonato's] behalf regarding" any issue other than the limited fee dispute between DiDonato and U.S. Legal at any time prior to November 13, 2014. (DiDonato Aff. ¶ 9.) Nonetheless, on September 25, 2013, Saraco represented to Hankey "that he had authority from DiDonato to agree to a settlement whereby DiDonato would accept, in full satisfaction of all of his claims against U.S. Legal, the amount of $4,000.00; in exchange for this payment, DiDonato would grant U.S. Legal Support a general release." (Hankey Decl. ¶ 8.) Hankey drafted an agreement reflecting these settlement terms (the "Settlement Agreement"), and e-mailed it to Saraco on September 26, 2013. (Id. ¶ 9, Ex. B; SMF ¶ 10, Ex. A.) On September 30, 2013, Saraco responded to U.S. Legal via e-mail, stating, "[t]his looks fine. . . . I will have it executed and sent to you asap." (SMF ¶ 11 (quotation marks omitted).) However, when Saraco sent this e-mail to U.S. Legal, he knew that DiDonato had not authorized him to execute a general release in favor of U.S. Legal in exchange for a $4,000.00 payment. (Id. ¶ 12.)

2

On October 18, 2013, Saraco sent a "Hold Harmless Agreement" to DiDonato, advising him that it contained all of the material terms of the Settlement Agreement that he had negotiated between DiDonato and U.S. Legal. (Id. ¶ 13, Ex. B.) That same day, intending to be bound by the terms set forth in the Hold Harmless Agreement, DiDonato executed the Hold Harmless Agreement and returned it to Saraco. (Id. ¶ 14; DiDonato Aff. ¶ 5.) The Hold Harmless Agreement states that U.S. Legal will make a $4,000.00 payment to DiDonato to "settle the dispute between the parties concerning monies due from U.S. Legal Support to DiDonato for services rendered by DiDonato on behalf of U.S. Legal Support." (SMF Ex. B ¶ 111 a.-b.) It then states that in exchange for this payment, DiDonato "agree[d] to cease and withdraw any legal action filed against U.S. Legal Support on these issues and not [] partake in any further legal action or claims against U.S. Legal Support concerning these and only these issues." (Id. Ex. B. ¶ III.c.) However, the Settlement Agreement does *not* contain these terms. (Compare id. Ex. A with id. Ex. B.)

On October 21, 2013, Saraco faxed to U.S. Legal a copy of the Settlement Agreement that appeared to bear DiDonato's signature. (Id. ¶ 15; see also id. ¶ 16; Hankey Decl. ¶ 11.) DiDonato's signature on the Settlement Agreement was "forged by Saraco without DiDonato's knowledge or approval." (SMF ¶ 25.) In fact, DiDonato neither saw nor received a copy of the Settlement Agreement before Saraco submitted it to U.S. Legal and he had not signed it. (Id. ¶ 16.) On October 23, 2013, Hankey informed Saraco that he had forwarded the Settlement Agreement to U.S. Legal's headquarters. (Id. ¶ 17; Hankey Decl. ¶ 12.) He also told Saraco that because U.S. Legal had a W-9 for Syndicated Reporters, Inc., but did not have a W-9 for DiDonato, U.S. Legal "would either have to issue the check to Syndicated Reporters or obtain a new W-9 for DiDonato." (SMF ¶ 17; Hankey Decl. ¶ 12.) When Saraco responded, he asked

3

Hankey if U.S. Legal could issue the payment to both himself and DiDonato. (SMF ¶ 18.) Hankey "then informed Saraco that, in order to process such a payment, U.S. Legal Support would require a W-9 for [Saraco] as well." (Hankey Decl. ¶ 13, Ex. E.) On October 24, 2013, Saraco provided a completed W-9 to U.S. Legal and again requested that U.S. Legal issue payment to DiDonato and himself. (SMF ¶ 19.) Later that day, Hankey informed Saraco that U.S. Legal would also need a signed authorization from DiDonato in order to issue the settlement payment jointly, to which Saraco responded "I will secure the note you requested and send [it] to you." (Id. ¶¶ 20-21; Hankey Decl. ¶¶ 15-16, Ex. H.)

On October 28, 2013, Saraco faxed a note to Hankey that Saraco represented had been signed by DiDonato. (SMF ¶ 22.) The note stated, "[p]lease allow this to confirm that I authorize the $4000.00 settlement in this matter, Gregory DiDonato and Syndicated Reports vs. US Legal Support, may be issued to myself and my attorney Joseph J. Saraco, Esquire." (Id. ¶ 22; Hankey Decl. ¶ 17, Ex. I.) On October 29, 2013, U.S. Legal mailed a letter directly to DiDonato, which stated:

> Enclosed is a fully executed Settlement Agreement by and between U.S. Legal . . . and Gregory DiDonato . . . . In addition, [enclosed] is a check made payable to both Syndicated Reporters, Inc. and Joseph J. Saraco (as per your request) in the amount of $4,000 in accordance with said Settlement Agreement.

(SMF ¶ 24, Ex. C (third alteration in original) (quotation marks omitted).) DiDonato received this letter on November 4, 2013, along with a copy of the Settlement Agreement purporting to incorporate DiDonato's signature, and a check in the amount of $4,000.00. (Id. ¶¶ 25-26.) Immediately thereafter, DiDonato emailed the letter and its enclosures to Saraco, stating, "Joe, got this today. The agreement is not what I signed that you sent. Advise." (Id. ¶ 27, Ex. D.) The next day, Saraco responded as follows:

4

> This is not our agreement. Not sure what they are trying to pull except that they are worried about you with the next battle. I have a good relationship with the attorney, and this was clearly not sent by him, so I will reach out to him today and give you a call. Meanwhile, you have the check so let's get that deposited. That should have been payable to you only.

(Id. ¶ 28, Ex. D.) DiDonato then asked Saraco if depositing the $4,000.00 check would constitute consent to the Settlement Agreement. (Id. ¶ 29, Ex. D.) Saraco responded that it "'will not be seen as consent to anything other than this particular case.'" (Id. ¶ 30 (quoting Ex. D).) After receiving Saraco's response to his query, DiDonato signed and deposited the check. (Id. ¶ 31.)

The Amended Complaint asserts three claims against U.S. Legal: Tortious Interference with Prospective Business Contracts (Count I); Breach of Contract (Count II); and violation of the Lanham Act (15 U.S.C. § 1125) (Count III). It also asserts four claims against Saraco: Fraud (Count IV); Professional Legal Malpractice (Count V); violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count VI); and Breach of Contract (Count VII). U.S. Legal has asserted a Counterclaim against DiDonato for Breach of Contract and a Crossclaim against Saraco for Fraud.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "'genuine'" if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . .'" Lujan v. Defs. of Wildlife, 504 U.S. 555, 590 (1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law . . . ." Anderson, 477 U.S. at 248.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has] cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to . . . the party who oppose[s] summary judgment." Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)).

## III. DISCUSSION

U.S. Legal has moved for summary judgment as to Counts I-III of the Amended Complaint and as to its Counterclaim. U.S. Legal contends that it is entitled to summary judgment because DiDonato is bound by the terms of the Settlement Agreement, which, it asserts, releases all of the claims DiDonato has brought against U.S. Legal.

A.  <u>Enforceability of the Settlement Agreement</u>

U.S. Legal contends that it is entitled to summary judgment because the claims against it are barred by the release contained in the Settlement Agreement, which states that DiDonato "irrevocably and unconditionally release[d], acquit[ted], and forever discharge[d] U.S. Legal Support . . . of and from any and all claims . . . which DiDonato . . . had, has, or may have against . . . U.S. Legal Support . . . which occurred on or before the Date of Execution of this Agreement." (Settlement Agreement ¶ 3.a.) DiDonato, however, maintains that the Settlement Agreement is not enforceable because he did not sign it or authorize Saraco to enter into it on his behalf. "The validity and enforceability of settlement agreements is governed by state contract law." <u>Shell's Disposal & Recycling, Inc. v. City of Lancaster</u>, 504 F. App'x 194, 200 (3d Cir. 2012) (citing <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 582 (3d Cir. 2009); <u>Mazzella v. Koken</u>, 739 A.2d 531, 536 (Pa. 1999)). Under Pennsylvania law we consider three factors in deciding whether a contract is enforceable: "'(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration.'" <u>Reynolds v. Univ. of Pa.</u>, 483 F. App'x 726, 734 (3d Cir. 2012) (quoting <u>ATACS Corp. v. Trans World Commc'ns, Inc.</u>, 155 F.3d 659, 666 (3d Cir. 1998)). When we determine whether parties have manifested an intent to be bound, we "consider 'not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.'" <u>Baldwin v. Univ. of Pitt. Med. Ctr.</u>, 636 F.3d 69, 75 (3d Cir. 2011) (quoting <u>Am. Eagle Outfitters</u>, 584 F.3d at 582; and citing <u>Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.</u>, 619 F.3d 1001, 1009 (3d Cir. 1980)). Thus, "[u]nder contract law, the objective manifestation of the parties is the governing factor regardless of subjective beliefs and reservations. An 'actual' meeting of the minds is not

7

necessary to form a contract." Rambo v. Greene, 906 A.2d 1232, 1236 (Pa. Super. Ct. 2006) (quoting Long v. Brown, 582 A.2d 359, 363 (Pa. Super. Ct. 1990)).

DiDonato argues that he could not have manifested his intent to be bound by the Settlement Agreement because he did not sign it. However, we also look at his other conduct. "'[A]n offer may be accepted by conduct and what the parties [do] pursuant to [the] offer is germane to show whether the offer is accepted.'" Ins. Co. of Greater N.Y. v. Fire Fighter Sales & Serv. Co., 120 F. Supp. 3d 449, 457 (W.D. Pa. 2015) (alterations in original) (quoting Hartman v. Baker, 766 A.2d 347, 351 (Pa. Super. Ct. 2000)), appeal dismissed No. 15-3291 (3d Cir. Feb. 23, 2016)). "Further '[w]hether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances.'" Lambrecht v. Liebl, No. 80 EDA 2015, 2015 WL 6737631, at *2 (Pa. Super. Ct. Aug. 7, 2015) (quoting Mountain Props. v. Tyler Hill Realty Corp., 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001)).

"'[W]hen the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact.'" EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 263 (3d Cir. 2010) (quoting Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 300 n.9 (3d Cir. 1986)). However, "'[t]he question of whether an undisputed set of facts establishes a contract is a matter of law.'" Enslin v. Coca-Cola Co., Civ. A. No. 14-6476, 2017 WL 1190979, at *7 (E.D. Pa. Mar. 31, 2017) (quoting Mountain Props., 767 A.2d at 1101; and citing Reitmyer v. Coxe Bros. & Co., 107 A. 739, 741 (Pa. 1919)).

Here, the facts that we consider with respect to whether the parties entered into an enforceable Settlement Agreement are undisputed. When we review the undisputed facts

8

regarding the parties' conduct, we observe that U.S. Legal sent a copy of the Settlement Agreement to DiDonato that purported to contain DiDonato's signature, along with a check for $4,000.00. (SMF ¶¶ 23-26.) Those documents were accompanied by a letter from U.S. Legal, which stated that the check was sent "in accordance with [the] Settlement Agreement." (Id. ¶ 24.) DiDonato told Saraco that he did not agree to the terms of the Settlement Agreement and that he was concerned that depositing the $4,000.00 check would be viewed as acceptance of those terms. (Id. ¶¶ 27, 29.) Nonetheless, DiDonato deposited the $4,000.00 check, even though the Settlement Agreement contained his forged signature. (Id. ¶¶ 25, 31.) The record does not show that DiDonato expressed his concerns about the Settlement Agreement to anyone other than Saraco prior to cashing the check.[1] (Id. ¶¶ 27, 29, 31.)

We conclude, based on these undisputed facts, that DiDonato's objectively manifested conduct expressed acceptance of the Settlement Agreement from the perspective of a reasonable person in U.S. Legal's position. See Lambrecht, 2015 WL 6737631, at *2 (quoting Mountain Props., 767 A.2d at 1101). DiDonato's endorsement and deposit of the $4,000.00 check in conformity with the terms of the enclosed Settlement Agreement constitutes evidence of an intent to be bound by the Agreement. See, e.g., Blaisdell Filtration Co. v. Bayard & Co., 166 A. 234, 236 (Pa. 1933) (stating that "when defendant retained and used the check sent by plaintiff, the latter was entitled to treat such retention and use as an acceptance of the terms on which the check was sent" (citations omitted)); Tangney v. Cronin, No. 468 EDA 2013, 2014 WL 10987421, at *4 (Pa. Super. Ct. Jan. 13, 2014) (holding that "[b]y accepting and depositing the check," the offeree "accepted the offer by conduct" (citing Penn-Allen Broad. Co. v. Traylor,

---

[1] We further note that that the record is devoid of any evidence that would indicate that U.S. Legal was aware that Saraco was acting beyond the scope of his authority. In fact, the record demonstrates that Saraco repeatedly misled U.S. Legal regarding his settlement authority. (See Hankey Decl. ¶ 8, 10-11, 17.)

9

133 A.2d 528, 531 (Pa. 1957); and Accu-Weather Inc. v. Thomas Broad. Co., 625 A.2d 75, 78 (Pa. Super. Ct. 1993))).

Moreover, DiDonato's failure to object to the executed Settlement Agreement by notifying U.S. Legal that the signature in the Settlement Agreement was not his, serves as an additional indicator of his intent to be bound by the terms of the Settlement Agreement. In a case involving a factually similar scenario, the offeree received a copy of a written agreement and, although he did not sign the agreement, he accepted the benefits offered to him pursuant to that agreement. Accu-Weather, 625 A.2d at 78. The Pennsylvania Superior Court concluded that the agreement should be enforced because the offeree "had a duty to speak when confronted with a document providing, unequivocally, that receipt of [the offeror's] services would be tantamount to assenting to the binding nature of the . . . Agreement." Id. at 79 (citations omitted). We find, in the instant case, that DiDonato's failure to object to the terms of the Settlement Agreement, coupled with his acceptance of the $4,000.00 check, would cause a reasonable person in the position of the parties to believe that DiDonato manifested his assent to the Settlement Agreement.

DiDonato contends that he demonstrated an objective lack of intent to be bound by the Settlement Agreement because, upon receiving a copy of the Agreement, he immediately contacted Saraco to tell him that he did not agree to the terms of the Agreement and was concerned that depositing the check would be construed as acceptance of those terms. (See SMF ¶¶ 27, 29.) However, Pennsylvania law is clear that only the actions that would have been apparent to U.S. Legal are relevant to our analysis. See Baldwin, 636 F.3d at 75 (citations omitted). DiDonato's concerns – voiced solely to his counsel – would not have been apparent to a "reasonable person in the position of the parties." Mountain Props., 767 F.2d at 1101. See,

e.g., Ingrassia Constr. Co. v. Walsh, 486 A.2d 478, 483 (Pa. Super. Ct. 1984) (stating that "it matters not whether [a party] truly believed a contract did not exist *if* his manifested intent reasonably suggested the contrary to [the opposing party]"); Mountain Props., 767 A.2d at 1101 (concluding that "[a] reasonable person would be led to understand that an agreement existed" where the party acknowledged its receipt of the offer to the opposing party and proceeded to make use of the benefit under the agreement).

DiDonato also argues that he cannot be bound by the Settlement Agreement because Saraco lacked express authority to settle DiDonato's claims. While "an attorney can only bind his client to a settlement based on express authority," Reutzel v. Douglas, 570 A.2d 787, 792 (Pa. 2005), we are concerned here with DiDonato's own actions. The issue is not whether Saraco bound DiDonato, but, rather, whether DiDonato bound himself by objectively manifesting his intention to be bound by the Settlement Agreement. As we discussed above, we find that DiDonato did objectively manifest such an intent.

In sum, although DiDonato subjectively believed that he had not entered into an enforceable contract, because his objective outward manifestations from the perspective of a reasonable person in the position of U.S. Legal suggested otherwise, only those outward manifestations are of consequence. See Rambo, 906 A.2d at 1236; Lambrecht, 2015 WL 6737631, at *2. In light of the undisputed evidence of record establishing that DiDonato endorsed and deposited the $4,000.00 check from U.S. Legal and failed to raise any objections to U.S. Legal regarding the terms of the Settlement Agreement or the signature on the document, we conclude, accordingly, that DiDonato manifested an intent to be bound by the Settlement Agreement. DiDonato does not dispute that the terms of the Settlement Agreement are sufficiently definite to be enforced and that there was consideration. Thus, we conclude as a

matter of law that the Settlement Agreement is an enforceable contract. Consequently, we next examine whether the claims asserted by DiDonato in the Amended Complaint are released by the release provision contained in the Settlement Agreement.

B. The Scope of the Release

U.S. Legal argues that all of the claims asserted against it fall within the scope of the release, thus entitling it to summary judgment as to all of DiDonato's claims. Releases are construed "according to principles of state contract law." Gunser v. City of Phila., 241 F. App'x 40, 42 (3d Cir. 2007) (citing Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 892 (3d Cir. 1975)). When a court construes the scope of a release, it must endeavor to honor the intentions of the parties. Ford Motor Co. v. Buseman, 954 A.2d 580, 583 (Pa. Super. Ct. 2008) (quoting Brown v. Cooke, 707 A.2d 231, 233 (Pa. Super. Ct. 1983)). "[R]eleases are strictly construed so as not to bar the enforcement of a claim that had not accrued at the date of the execution of the release." Fortney v. Callenberger, 801 A.2d 594, 597 (Pa. Super. Ct. 2002) (citing Vaughn v. Didizian, 648 A.2d 38, 40 (Pa. Super. Ct. 1994)). "'In cases of a written contract, the intent of the parties is the writing itself,'" Lesko v. Frankford Hosp.-Bucks Cty., 15 A.3d 337, 342 (Pa. 2011) (quoting Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 905 A.2d 462, 468 (Pa. 2006)), and "'it is well settled that the effect of a release is to be determined by the ordinary meaning of its language.'" Pennsbury Vill. Assocs., LLC v. Aaron McIntyre, 11 A.3d 906, 914 (Pa. 2011) (quoting Taylor, 778 A.2d at 667).

The release provision of the Settlement Agreement states, in pertinent part, as follows:

> 1. *Payments by U.S. Legal Support.* In consideration for the undertakings of the other parties to this Agreement, U.S. Legal Support shall pay to DiDonato the sum of four thousand dollars ($4,000.00). . . .

> 3. *Mutual General Releases.*
>    a. Upon completion of the payments set forth in section 1, Gregory DiDonato . . . agrees to irrevocably and unconditionally release, acquit, and forever discharge U.S. Legal Support of and from any and all claims . . . which DiDonato . . . had, has, or may have against . . . U.S. Legal Support . . . arising out of or in any way resulting from or otherwise related to any circumstances, event, act, occurrence, or omission of or by . . . U.S. Legal Support . . . **which occurred on or before the Date of Execution of this Agreement.**

(Settlement Agreement ¶¶ 1, 3 (emphasis added).) DiDonato concedes that, if the Settlement Agreement is enforceable, the claims contained in Counts II and III of the Amended Complaint would fall within the scope of the release, but argues that "[b]ecause discovery in the instant matter was limited to the circumstances and negotiations of the [Settlement] Agreement, a genuine issue of material fact exists as to the applicability of the [Settlement] Agreement" to the claim of Tortious Interference with Prospective Business Contracts asserted in Count I.[2] (Pl.'s Mem. at 8.) The Amended Complaint alleges that after U.S. Legal ended the parties' business relationship on July 10, 2013, U.S. Legal "informed potential business clients" of DiDonato that he "was subject to a restrictive covenant not to compete with U.S. Legal Support, Inc. if he left their employment, and therefore, potential clients should not do business with him." (Am. Compl. ¶ 31.) If the alleged tortious interference took place before the Settlement Agreement became effective, that claim would be barred by the release, but, if it took place after the

---

[2]Under Pennsylvania law, to prevail on a claim for tortious interference with existing or prospective contractual relationships, a party must prove: (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009) (citing Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998)).

Settlement Agreement became effective, a claim arising from that conduct would not be barred by the release. See Fortney, 801 A.2d at 598 (citing Vaughn, 648 A.2d at 40). The record before us on this Motion, however, does not contain any evidence regarding U.S. Legal's alleged tortious interference with DiDonato's prospective clients. As a result, there is no evidence that would establish whether DiDonato's claim for tortious interference accrued after the effective date of the Settlement Agreement. Consequently, there is a genuine issue of material fact as to whether the tortious interference claim falls within the ambit of the release. See Celotex Corp., 477 U.S. at 323.

U.S. Legal argues that it is nonetheless entitled to summary judgment as to Count I because DiDonato has the burden of establishing that his claim is not barred by the release and he has presented no evidence in that regard. See Fed. R. Civ. P. 56(c)(1); Celotex, 477 U.S. at 322. DiDonato asserts, in response, that U.S. Legal's Motion should be denied as to Count I because he lacked the requisite evidence as a result of the phased discovery plan entered in this case. The parties have been permitted to conduct discovery only with regard to the circumstances and objectives of the release. (See June 28, 2016 Order.) DiDonato asks that we deny the Motion with regard to Count I of the Amended Complaint on that basis and has submitted the Affidavit of his attorney, Donald Benedetto, pursuant to Rule 56(d) in support of this request. Federal Rule of Civil Procedure 56(d) provides that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). An affidavit filed pursuant to Rule 56(d) must identify with specificity "'what particular information is sought; how, if uncovered, it would preclude summary judgment; and

why it has not previously been obtained.'" Pennsylvania Dep't of Pub. Welfare v. Sebelius, 674 F.3d 139, 157 (3d Cir. 2012) (quoting Dowling v. City of Phila., 855 F.2d 136, 139 (3d Cir. 1988)).

Donald Benedetto states in his Affidavit that if additional discovery is permitted, DiDonato would seek evidence of actual and potential clients of DiDonato and U.S. Legal, take the deposition of an attorney who was informed by U.S. Legal that DiDonato was subject to a non-compete agreement, and take depositions of some of U.S. Legal's clients to determine whether U.S. Legal interfered with DiDonato's prospective contracts and the timeframe of such interference. (Benedetto Aff. ¶¶ 4-6.) Benedetto further states that such discovery, which "has not been conducted because of Plaintiff's adherence with the Court's Order of June 28, 2016," would allow DiDonato to determine if the tortious interference claim contained in Count I falls within the scope of the release. (Id. ¶¶ 7-8.) Because the Affidavit details the information sought, its significance with respect to the Summary Judgment Motion, and the reason the information is currently unavailable, we conclude that DiDonato's submissions comply with Rule 56(d) and we deny the Motion for Summary Judgment as to Count I pursuant to Rule 56(d)(1).

U.S. Legal also argues that we should not allow DiDonato to conduct additional discovery with respect to Count I because his attorney represented during the Court's June 28, 2016 pretrial conference "that the release, if valid, was case dispositive." (U.S. Legal's Reply at 8.) However, we have no record of DiDonato's counsel making any such representation, and, moreover, the June 28, 2016 Order is inconsistent with U.S. Legal's assertion. (See June 28, 2016 Order (stating that limited discovery is to be conducted "with respect to the circumstances of and negotiations regarding the Mutual General Release" and that "the overall discovery

15

deadline will be Stayed until the Motion or Motions [for partial summary judgment] are resolved").) Consequently, we reject U.S. Legal's argument that we should deny DiDonato's request for additional discovery with respect to Count I on this basis.

Accordingly, we deny the Motion for Summary Judgment as to Count I pursuant to Rule 56(d)(1). Because DiDonato concedes that the claims contained in Counts II and III are within the scope of the release contained in the Settlement Agreement (see Pl.'s Mem. at 8), we grant U.S. Legal's Motion for Summary Judgment as to those claims.

### C. U.S. Legal's Counterclaim

Finally, U.S. Legal maintains that it is also entitled to summary judgment as to the breach of contract Counterclaim that it has asserted against DiDonato. Specifically, it argues that DiDonato is bound by the release contained in the Settlement Agreement, and that by filing the instant suit, DiDonato breached that Agreement. The elements of a breach of contract claim are: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016) (citing J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc., 792 A.2d 1269, 1272 (Pa. Super. 2002)). "'Resultant damages' are those damages suffered from the breach." 412 N. Front St. Assocs., LP v. Spector Gadon & Rosen, P.C., 151 A.3d 646, 657 (Pa. Super. Ct. 2016) (quoting McShea v. City of Phila., 995 A.2d 334, 340 (Pa. 2010) and citing Logan v. Mirror Printing Co. of Altoona, 600 A.2d 225, 226 (Pa. Super. Ct. 1991)). "In order to prove damages, 'a plaintiff must give a factfinder evidence from which damages may be calculated to a reasonable certainty.'" Ins. Co. of Greater New York v. Fire Fighter Sales & Serv. Co., 120 F. Supp. 3d 449, 461 (W.D. Pa. 2015), appeal dismissed (Feb. 23, 2016) (quoting Ware v. Rodale Press, Inc., 322 F.3d 218, 226 (3d Cir. 2003)).

We have already concluded that the Settlement Agreement is an enforceable contract. Thus, the first element – the existence of a contract – is satisfied. See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C., 137 A.3d at 1258 (citation omitted). The second element – breach of the contract - is also satisfied because, as previously noted, DiDonato "concedes that if the Agreement is found to be effective, Counts II and III of [the Amended Complaint] . . . would fall within its scope." (Pl.'s Mem. at 8.) See also Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C., 137 A.3d at 1258 (citation omitted). However, although the record demonstrates that U.S. Legal has incurred damages in the form of attorneys' fees and costs, no attempt has been made to apportion the amount of attorneys' fees expended as to each Count of the Amended Complaint and the Counterclaim. Thus, we do not have evidence on the record from which the third element, the damages that resulted from DiDonato's breach of the Settlement Agreement by bringing claims II and III of the Amended Complaint, could be "calculated to a reasonable certainty." See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C., 137 A.3d at 1258 (citation omitted); Ins. Co. of Greater New York, 120 F. Supp. 3d at 461 (citation omitted). Accordingly, we deny the Motion for Summary Judgment as to U.S. Legal's Counterclaim.

## IV. CONCLUSION

For the foregoing reasons, we grant U.S. Legal's Motion for Summary Judgment as to Counts II and III of the Amended Complaint and we deny the Motion as to Count I of the Amended Complaint and the Counterclaim. An appropriate Order follows.

BY THE COURT:


/s/ John R. Padova, J.
John R. Padova, J.